IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,            )
                                     )
     Plaintiff,                      )    No. 13-20303
                                     )
v.                                   )
                                     )
LINDELL LOGAN LUCK,                  )
                                     )
     Defendant.                      )

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTIONS TO SUPPRESS

Before the Court are Defendant Lindell Logan Luck's ("Logan") November 15, 2013 Motion to Suppress Defendant's Statements ("Motion to Suppress Statements"), Logan's November 15, 2013 Motion to Suppress Items Obtained in Execution of Search Warrant ("Motion to Suppress Items"), the Magistrate Judge's January 27, 2014 Report and Recommendation (the "Report"), and Logan's February 10, 2014 Objections to the Magistrate Judge's Report and Recommendation (the "Objections"). (Mot. Suppress Statements, ECF No. 20; Mot. Suppress Items, ECF No. 21; Report, ECF No. 33; Objections, ECF No. 38.) The United States of America (the "Government") responded to the Objections on February 24, 2014. (Resp., ECF No. 46.) Logan objects to the Magistrate Judge's recommendation that the Court deny Logan's Motions to Suppress. Having reviewed Logan's

Objections, the Court OVERRULES them and ADOPTS the Report of the Magistrate Judge. Logan's Motion to Suppress Statements and Motion to Suppress Items are DENIED.

## I. Procedural and Factual Background

On January 7, 2014, the Magistrate Judge held an evidentiary hearing on Logan's Motions to Suppress. (ECF No. 28.) The Government called two witnesses: Memphis Child Exploitation Task Force ("MCETF") Agent Aaron Thompson ("Agent Thompson") and Agent Keith Melancon ("Agent Melancon"). (Report at 2.) The Government introduced two exhibits: the search warrant and return, and Logan's written statement made during the search. (Id.) The defense called three witnesses: Donnie Luck ("Donnie"), Carol Lynne Luck ("Lynne"), and Logan. (Id.) The defense introduced two exhibits: two photographs of Logan's home at the time of the search, and Agent Thompson's Report of Investigation. (Id.)

The Magistrate Judge made the following findings of fact. On October 22, 2012, United States Magistrate Judge Tu M. Pham issued a warrant for the search of Logan's residence in Halls, Tennessee, for child-pornography-related evidence. (Report at 3.) The search warrant stated that it should be executed "on or before November 1, 2012 in the daytime 6:00 A.M. and 10:00 P.M." (Id. at 3.)

On October 24, 2012, six MCETF agents arrived at the residence minutes before 6:00 A.M. Agent Thompson testified that the agents arrived a couple of minutes before 6:00 A.M. and waited in the car until 6:00 A.M. before knocking on the door. (Id. at 3-4.) Agent Melancon testified that the agents arrived at the Luck home at 5:55 A.M. and rang the doorbell at 6:00 A.M. (Id. at 5.) The search warrant return states that the warrant was executed at 6:00 A.M. (Id. at 4.) Agent Thompson testified that the agents exited the car at exactly 6:00 A.M., not "approximately" as he had written in his Report of Investigation. (Id.) Agent Thompson testified that it was dark outside when the warrant was executed. (Id.)

Donnie answered the door of the residence at around 6:01 or 6:02 A.M. (Id. at 4.) Agent Thompson testified that he told Donnie that the agents had a search warrant and asked if anyone else were at home. (Id.) Donnie told the agents his wife and son were there. (Id.) Agent Thompson told Donnie the agents needed to enter the home and asked Donnie to gather his wife and son in the living room. (Id.) Donnie led Agents Thompson and Melancon into the home to wake Lynne, and then to wake Logan. (Id. at 4-5.) Agent Melancon shined his flashlight into Lynne's room, but neither the agents nor Donnie entered the room. (Id. at 5.) Agents Thompson and Melancon and the Lucks gathered in the living room while the other agents performed a protective

sweep of the home. (Id. at 5.) The other agents returned to the living room after clearing the house. (Id.)

Donnie and Lynne's testimony about the time the agents arrived conflicted with the testimony of Agents Thompson and Melancon. Donnie testified that the agents rang the doorbell before 6:00 A.M. (Id. at 6.) Donnie stated that he sets his alarm for 6:00 A.M. every morning and that the alarm had not gone off when the agents rang the doorbell. (Id.) Donnie stated that, when he went into the bedroom to wake Lynne, he heard the alarm and turned it off. (Id.)

Lynne testified that she heard a car in the driveway and saw flashing lights out the window between ten and fifteen minutes before 6:00 A.M. that morning. (Id.) She could not recall the exact time. (Id.) Lynne stated that she heard the doorbell immediately after. (Id.) Lynne testified that Donnie did not enter the bedroom to wake her and that she did not remember the alarm clock sounding. (Id. at 6-7.)

When the Lucks had gathered in the living room, Agent Thompson informed them that they did not have to stay while the warrant was executed, but the agents would like to ask the family some questions. (Id. at 7.) Donnie agreed to stay and talk to the agents although he had to go to work. (Id.) The agents asked questions about computer use, the number of computers in the house, and what kind of internet connection the

4

Lucks had. (Id.) Logan answered several questions and indicated he was familiar with peer-to-peer networks and had used them before. (Id.) Given Logan's familiarity with peer-to-peer networks, the agents asked to speak with him privately, because he was an adult. (Id.) Both Agents Thompson and Melancon testified that Logan and his parents agreed. (Id. at 8, 9.) Agent Thompson, Agent Melancon, and Logan went to a bedroom about twenty feet from the living room while the other agents remained with Donnie and Lynne. (Id. at 8.)

Agent Thompson described the interactions with Logan as calm because there were no raised voices. (Id.) Both Agent Thompson and Agent Melancon testified that the agents did not brandish their weapons, issue threats, indicate that anyone would be arrested, or block or lock any doors. (Id. at 7, 8-9.) Agent Melancon testified that the interaction was a "back-and-forth" discussion. (Id. at 9.) Agent Thompson testified that he did not think that any of the Lucks were under the influence of anything. (Id. at 7-8.) Logan answered questions calmly when asked. (Id. at 8.) Agent Melancon testified that the Lucks were told to sit for officer safety. (Id.) When Agent Melancon apologized for the early hour, Donnie said he was already up to get ready for work. (Id.) Agent Melancon testified that the agents told Donnie he could leave for work or

to make a call, but an agent would have to escort him if he left the room.  (Id.)

Donnie and Lynne's testimony about the interaction with the agents in the living room conflicted with the testimony of Agents Thompson and Melancon.  Donnie testified that he was in his underwear and was told to sit down to be interviewed.  (Id. at 9.)  Donnie testified that he did not think he was free to leave and did not ask to change immediately.  (Id.)  Lynne testified that she was in her nightgown and robe and was told to sit down.  (Id.)  Lynne stated that she did not think she was free to leave because "when officers come in with guns and say sit down, you sit down."  (Id.)  Lynne stated that she was intimidated by the agents' presence.  (Id.)  Although the search lasted about two hours, Donnie and Lynne testified that they were not told they were free to leave until about fifteen minutes before the agents left.  (Id.)  Donnie testified that, when he was told he could leave, he indicated he would stay because he did not want to leave Lynne alone.  (Id. at 9-10.) Both testified that they were not read their rights.  (Id. at 10.)  Donnie denied telling the agents that he was already awake when they arrived.  (Id.)  Donnie and Lynne acknowledged that the agents did not use threats, block doorways, brandish weapons, coerce them, or prevent them from using the telephone, from changing their clothes, or from showering.  (Id.)

Lynne testified that, when the agents asked to speak to Logan alone, it never occurred to her to accompany him because she thought someone outside the family was responsible for any illegal activities. (Id.) Donnie and Lynne testified that Logan agreed to speak with the agents alone to show them the websites he visited. (Id.)

When Agents Thompson and Melancon interviewed Logan alone in the bedroom (the "first interview"), the door remained open. (Id.) Agent Thompson testified that Logan sat on the bed, Agent Melancon sat or stood by the door, and Agent Thompson sat in the desk chair. (Id. at 10-11.) Logan was not restrained. (Id. at 11.) Agent Thompson testified that he asked Logan if he needed to be anywhere, and Logan said he did not. (Id.) Agent Thompson asked Logan if he had ever seen child pornography. (Id.) Logan said that he had with a friend who had downloaded peer-to-peer software on a laptop. (Id.) Logan said that after they downloaded and looked at the images, he told his friend to delete them but was not sure if he did. (Id.) Logan said that the laptop was at Donnie's work to be repaired. (Id.) Logan told the agents that his friend gave him a thumb drive of images before he moved. (Id.) After the first interview, the agents believed the Lucks had only one laptop and one desktop computer. (Id.)

Agent Thompson testified that the first interview lasted between fifteen and twenty minutes. (Id.) Agent Thompson described the conversation as calm and stated that Logan answered every question. (Id.) Logan consented in writing to the search of his e-mail and Facebook accounts and the laptop at Donnie's office, and provided the agents with the usernames and passwords for those accounts. (Id. at 11-12.) Agent Melancon's testimony was consistent with that of Agent Thompson. (Id. at 12.)

After the first interview, Agents Thompson and Melancon joined the other agents in searching the home. The Lucks remained in the living room. (Id.) The agents found a laptop in Logan's bedroom that Logan had not mentioned in the first interview. (Id.) Agent Thompson testified that they asked Logan to come to an upstairs bedroom to speak with them alone again (the "second interview"). (Id.) Agents Thompson and Melancon testified that no restraints, coercion, or threats were used, and that Logan was free to leave during the second interview. (Id.) Logan and Agent Melancon were seated in chairs, and Agent Thompson was seated on the floor. (Id.) Agent Thompson testified that he did not consider Logan to be in custody. (Id.)

Donnie testified that the agents did not ask Logan to go to the upstairs bedroom, but said, "Logan, come with us." (Id.)

During the second interview, Agents Thompson and Melancon told Logan that they had found the second laptop and would have the computers forensically examined. (Id.) They asked Logan if he had anything else to say. (Id.) Logan confessed that he had looked at child pornography as recently as a week and a half before using Limewire and Frostwire. (Id. at 12-13.) Logan said he had downloaded child pornography onto the thumb drive his friend gave him. (Id. at 13.)

Agent Thompson testified that he advised Logan of his rights, and asked if Logan wanted to make a statement. (Id.) Logan agreed and asked Agent Thompson to write the statement. (Id.) Agent Thompson told Logan that he could review it and make changes. (Id.) The signed and witnessed statement stated:

> I, Lindell "Logan" Luck, am giving this statement freely and voluntarily without threats or force from Law Enforcement. I have been advised of my right to refuse such statement and remain silent. I have requested Special Agent Thompson to write this statement as I tell it in my words.

> I began looking at child pornograph[y] when I was younger with a friend, Colton, and it grew into a habit. I do not get sexual gratification from it. I do it to relieve stress because it gives me a sense of control in my life. I want to stop but I've never been able to stop on my own from looking at it. I'm sorry for putting everyone through what I've put them through--my family.

(Id.) Agent Thompson wrote the first paragraph in his words. (Id.) Agent Thompson stated that he advised Logan of his right to talk to a lawyer, but did not include it in the statement or

his Report of Investigation. (Id.) Agent Thompson did not record the conversation because it was not normal procedure to do so. (Id. at 14.)

The second interview lasted between twenty and forty-five minutes. (Id.) Logan then joined Donnie and Lynne in the living room. (Id.) During the second interview, the other agents finished the search and had the family sign the receipt of property forms. (Id.) The agents left the Luck home at approximately 8:00 A.M.

Donnie and Lynne testified that Logan was diagnosed with acute lymphocytic leukemia when he was eight years old. (Id.) He was treated at St. Jude Children's Research Hospital with chemotherapy for three years, until he was eleven years old. (Id.) His last treatment was in 2001. (Id.) Logan is in remission, but suffers "auditory discretion problems," necrosis of the knees and ankles, pain, and short-term memory loss. (Id.) Lynne testified that Logan has "fuzziness" because you cannot figure out when he switches from one topic to another. (Id.) Logan is considered somewhat disabled and receives special accommodations in the classroom. (Id. at 14-15.) He is also dyslexic. (Id. at 15.) He has taken college courses periodically and was enrolled in classes when the search took place. (Id.) He has always lived with his parents and is now twenty-three years old. (Id.)

At the time of the search, Logan was taking melatonin as a sleep aid and Benadryl as a sleep aid and for his sinuses. (Id.) The medications were not recommended by a doctor. (Id.) He had been taking those medications every evening before bed for six months before the search. (Id.) Logan testified that the night before the search, he took those medications between 9:30 P.M. and 10:00 P.M., and went to bed. (Id. at 15-16.) Logan testified he fell asleep at approximately 11:00 P.M. (Id.) Logan and Lynne testified that Lynne saw him take the medications in the kitchen. (Id. at 16.)

Donnie and Lynne testified that when Logan takes the medications before he goes to bed, he does not function well in the morning. (Id. at 15.) He does not usually speak unless spoken to and responds, but not always appropriately. (Id.) Lynne described his morning state after taking the medications as a "daze." (Id.) Logan testified that the medications turn him into a "zombie" for about an hour and half to two hours after he wakes up. (Id.)

Logan testified that he has no memory of the morning of October 24, 2012, until approximately 9:00 to 9:15 A.M. (Id. at 16.) He testified he did not remember any of the events of the search, including the interviews with the agents, his consent to search, and his written statement. (Id.) He believes the medications are the explanation for his lack of memory. (Id.)

Both Agents Thompson and Melancon testified that they had no impression that Logan was under the influence of anything. (Id.)  Agent Melancon testified that it did not appear that Logan had difficulty understanding, needed guidance, or was in a daze.  Logan spoke in complete sentences, did not need help finding words or walking, and recalled his usernames and passwords.  (Id.)

Logan was subsequently indicted for one count of distribution of child pornography, in violation of 18 U.S.C. § 2256(a)(2), and two counts of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  (Indictment, ECF No. 1.)

## II.  Standard of Review

"A district judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C).  After reviewing the evidence, the court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1)(C).  Failure to object to a report and recommendation waives a party's right to de novo review.  Fed. R. Crim. Pro. 59(b)(2).  The district court should adopt the findings and

rulings of the magistrate judge to which no specific objection is filed.  <u>Thomas v. Arn</u>, 474 U.S. 140, 150 (1985).[1]

## III. Analysis

### A. Objections to Findings of Fact

Logan first objects to the Magistrate Judge's characterization of the agents and the Lucks as "gathering in the living room." (Objections ¶ 1.) According to Logan, "a fair characterization was that the Luck family 'was gathered' in the living room by the agents." Logan agrees that the characterization of Agent Melancon's testimony as "he explained that everyone in the home was gathered in one place and told to sit for purposes of officer safety" is fair. (<u>Id.</u>)

The Report states that Agent Thompson testified Donnie answered the door when the agents rang the doorbell. (Report at 4.) The agents asked if anyone else were home, and Donnie told them his wife and son were. (<u>Id.</u>) Agent Thompson testified that the agents needed to enter the home and "asked that Donnie [] gather his wife and son in the living room." (<u>Id.</u>) Donnie let them into the house and "then led Agent Thompson and Agent Melancon to the master bedroom to wake his wife, and then to Logan's room to wake his son." (Report at 4-5.) After that, "Agent Thompson, Agent Melancon, and the three Lucks gathered in

---

[1] The Sixth Circuit has applied <u>Arn</u> to report and recommendations in the criminal context. <u>U.S. v. Davis</u>, 300 F. App'x 393, 399 (6th Cir. 2008).

the living room as the other agents checked to ensure that no one else was in the residence." (Report at 5.) Agent Melancon testified that, after the agents accompanied Donnie to wake his wife and son, "[t]he Luck family and the agents then gathered in the living room." (Id. at 5-6.) During this time, the other agents checked to ensure no one else was in the home. (Id. at 5.)

It is clear from Agents Thompson and Melancon's testimony that the agents asked to enter the Luck home, asked Donnie to collect his family in the living room, accompanied him to wake his wife and son while the other agents performed a protective sweep of the home, and then accompanied the Lucks to the living room. There is no semantic or meaningful difference between the finding that Logan objects to and the finding he states is a "fair characterization." The Court sees no reason to reject or modify the Magistrate Judge's factual finding. The Court OVERRULES Logan's first objection.

Logan next objects that "the report does not point out that Ms. Luck testified that an agent was present with them the whole time they were sitting in the living room." (Objections ¶ 2.)

When discussing the testimony of Donnie and Lynne, the Report states that, "Agents remained in the living room with the Lucks for the entirety of the search." (Report at 10.) Although the Report does not explicitly state that Lynne

14

testified to this fact, the fact is stated clearly. The Court sees no reason to modify the Magistrate Judge's factual finding. The Court OVERRULES Logan's second objection.

## B. Objections to Conclusions of Law

### 1. Time of the Execution of the Search Warrant

Logan's third and fourth objections relate to the Magistrate Judge's conclusions about the time the agents executed the search warrant.

#### a. Credibility Determinations

Logan first objects to the Magistrate Judge's crediting Agents Thompson and Melancon's testimony about the time of the search. (Objections ¶ 3.) Logan contends that "even the agents' report used the word 'approximate' when describing the time of entry" and that "the parents established the search was conducted previous to 6:00 a.m." (Id.)

The Court is "'statutorily and constitutionally required' to engage in a de novo review" of the credibility of witnesses. United States v. Hampton, 2011 WL 5142984, at *6 (W.D. Tenn. Oct. 28, 2011) (quoting United States v. Burcham, 388 F. App'x 478, 481 (6th 2010)). Although the standard is de novo, courts in the Sixth Circuit are "generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness and assess his demeanor." Peveler v. United States, 269 F.3d 693, 702 (6th

Cir. 2001) (citing <u>Ramsey v. United Mine Workers of Am.</u>, 481 F.2d 742, 747 (6th Cir. 1973)). So long as the magistrate judge is in the best position to assess a witness's credibility, courts give deference to the trier of fact. <u>United States v. Hill</u>, 195 F.3d 258, 264-65 (6th Cir. 1999).

Logan argues that the Magistrate Judge's credibility determination is not supported by the facts. He cites the Report of Investigation, which states the "approximate" time the agents entered the Luck home was 6:00 A.M.

A de novo review of the record reveals that the Magistrate Judge was in the best position to evaluate all witnesses' credibility. <u>United States v. Freeman</u>, 412 F. App'x 735, 743 (6th Cir. 2010). The Magistrate Judge found that Agent Thompson testified that the exact time the agents exited their vehicles was 6:00 A.M. (Report at 4.) The sworn search warrant return states that the agents executed the warrant at 6:00 A.M. (<u>Id.</u>) Agent Melancon confirmed that the agents did not ring the Luck's doorbell until 6:00 A.M. The Court's review of the record is consistent with the Magistrate Judge's observation of each witness. After weighing the evidence before her, the Magistrate Judge concluded, and the Court agrees, that Agents Thompson and Melancon were more credible than Donnie and Lynne. The record provides "no compelling reason to second-guess the magistrate

judge's decision." <u>Peveler</u>, 269 269 F.3d at 702; 412 F. App'x at 743. The court OVERRULES Logan's third objection.

### b. Alleged Violation of Rule 41(d)

Logan also objects to the Magistrate Judge's conclusion that, even if the agents executed the search warrant ten to fifteen minutes before 6:00 a.m., "the Court finds that this Rule 41 violation would not warrant the application of the exclusionary rule because there is no evidence that prejudice resulted, or that agents acted with intentional disregard for the rule." (Objections ¶ 4.) Logan argues that, because Agents Thompson and Melancon testified they were familiar with Rule 41, they intentionally disregarded the rule if they executed the warrant before 6:00 A.M. (<u>Id.</u>) Logan also argues that he was prejudiced because items were found that the government intends to use in its case in chief against him. (<u>Id.</u>)

"'Daytime' means the hours between 6:00 a.m. and 10:00 p.m. according to local time." Fed. R. Crim. Pro. 41(a)(2)(A). "Violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." <u>United States v. Searp</u>, 586 F.2d 1117, 1125 (6th Cir. 1978) (internal citation and quotation marks omitted). "[A]lthough the procedural steps

enumerated in Rule 41(d) are important and should not be disregarded, they are ministerial and '[a]bsent a showing of prejudice, irregularities in these procedures do not void an otherwise valid search.'" Frisby v. United States, 79 F.3d 29, 32 (6th Cir. 1996) (quoting United States v. McKenzie, 446 F.2d 949, 954 (6th Cir. 1971)).

Logan's argument that the agents intentionally violated Rule 41(d) if they executed the search warrant before 6:00 A.M. is not well taken. Even if the warrant had been executed before 6:00 A.M., it is clear the agents had intended to wait until 6:00 A.M. Agent Thompson testified that they waited in the car before knocking on the door when they arrived at the Luck home. (Report at 3-4.) Agent Melancon testified that he looked at his watch when they arrived at the Luck home and then waited before approaching the house. (Id. at 5.) Those measures demonstrate that the agents did not intend to violate the requirements of Rule 41(d).

Logan's argument that he was prejudiced by the search is also not well taken. Prejudice in this context means that "the search might not have occurred or would not have been so abrasive if the Rule had been followed . . . ." Searp, 586 F.2d at 1125. The search would have occurred if the agents had followed Rule 41(d), albeit a few minutes later. There is no evidence that if the agents had waited a few minutes more, the

search would have been less abrasive. If the agents violated Rule 41(d), Logan was not prejudiced by that violation. The Court OVERRULES Logan's fourth objection.

### 2. **Logan Was Not In Custody During the First and Second Interviews**

Logan's fifth and sixth objections relate to the Magistrate Judge's conclusion that Logan was not in custody during the first and second interviews with Agents Thompson and Melancon. Logan objects to the Magistrate Judge's conclusion that:

> Considering these factors, the Court finds that the interrogation of Logan during his first and second interviews on October 24, 2012 did not rise to the level of a custodial interrogation.

(Report at 23.) Logan also objects to the Magistrate Judge's conclusion that:

> Based on these factors, the Court finds that a reasonable person in Logan's position would have felt free to leave or to stop the interview with the agents. Whether or not the agents specifically told him that he was free to leave, the objective circumstances indicated that he was.

(<u>Id.</u> at 25.)

Logan argues that, based on the totality of the circumstances, a reasonable person would not have believed he was allowed to leave. (Objection ¶ 7.) Logan argues that no one in his family has a criminal history. (<u>Id.</u>) The family was awakened in the dark by officers with a search warrant. (<u>Id.</u>) The officers had weapons and were shining flashlights. (<u>Id.</u>)

The family was told to gather in the living room where an officer remained with them at all times. (Id.) The Lucks wore sleepwear or undergarments. (Id.) Donnie and Lynne testified that they were not told they could leave until near the end of the search after the questioning had taken place. (Id.)

"[P]olice officers are not required to give Miranda warnings to everyone whom they question. . . . Miranda warnings are required only where . . . a person . . . [is] 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Custody means "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal citation and quotation marks omitted). A noncustodial situation "is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of a formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" Mathiason, 429 U.S. at 495. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Id.

"In evaluating whether a defendant was in [custody], we look to the totality of the circumstances to determine how a

reasonable man in the suspect's position would have understood

the situation." United States v. Crossley, 224 F.3d 847, 861

(6th Cir. 2000) (internal citation and quotation marks omitted).

One factor is whether a reasonable person in the suspect's

situation "would have believed that [he] was free to terminate

the interrogation and leave." Id. (internal citation omitted).

The Sixth Circuit also considers other factors:

> (1) the purpose of the questioning; (2) whether the
> place of the questioning was hostile or coercive; (3)
> the length of the questioning; and (4) other indicia
> of custody such as whether the suspect was informed at
> the time that the questioning was voluntary or that
> the suspect was free to leave or to request the
> officers to do so; whether the suspect possessed
> unrestrained freedom of movement during questioning;
> and whether the suspect initiated contact with the
> police or voluntarily admitted the officers to the
> residence and acquiesced to their requests to answer
> some questions.

Id. (internal citation omitted).

Logan was not in custody during the first and second

interviews. Donnie and Lynne's testimony that they were not

told they could leave the house is not relevant to the issue of

whether Logan was in custody.

The place of questioning was not hostile or coercive, and

there were no indicia of custody. The Sixth Circuit has opined

that, "when police question a suspect in a residence, the

encounter often will not rise to the kind of custodial situation

that necessitates Miranda warnings." United States v. Panak,

552 F.3d 462, 466 (6th Cir. 2009) (internal citations and quotation marks omitted). At home, a suspect is in familiar surroundings and not isolated or subject to the will of the examiner. Id.; Beckwith v. United States, 425 U.S. 341, 346 & n.7 (1976). "The number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell . . . ." Panak, 552 F.3d at 466.

Logan was in familiar surroundings during the first and second interviews. There were only two agents involved in those interviews. Both Agents Thompson and Melancon testified that no one raised his voice and that none of the agents brandished a weapon. (Report at 7, 24.) Their questioning of Logan was calm. (Id. at 11-12, 24.) Logan was not restrained, and the doors remained open during both interviews. (Id. at 10, 12, 24.) Agents Thompson and Melancon did not attempt to block the doors or prevent Logan from leaving the room. (Id. at 10-12, 24.) There is no evidence that the agents' conduct transformed the Luck home into an interrogation cell.

The length of the first and second interviews does not suggest that Logan was in custody. The first interview lasted between twenty and thirty minutes. (Id. at 24.) The second interview lasted between twenty and forty-five minutes. (Id.) At most, the interviews lasted a total of an hour and a half.

The Sixth Circuit has held that an interview of that length, without more, does not rise to the level of a custodial interrogation.  United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999).

During the second interview, Agent Thompson advised Logan of his right to remain silent, that his statements were voluntary, and that he had the right to speak with an attorney. (Report at 13, 25.)  Except for the right to an attorney, those rights were also included in the written statement Logan reviewed and signed.  (Id.)

Based on the totality of the circumstances, a reasonable person would not believe that he was in custody.  The Court OVERRULES Logan's fifth and sixth objections.

### 3. Logan's Statements Were Voluntary

Logan's seventh, eighth, ninth, and tenth objections address the Magistrate Judge's conclusion that Logan gave his statements voluntarily.  Logan objects to the Magistrate Judge's conclusion that:

> The Court finds that the agents did not use coercion to overcome Logan's will or to motivate his decision to issue a written statement or to consent to the search of his online accounts and laptop computer.

(Report at 28.)  Logan objects to the Magistrate Judge's conclusion that, "These facts do not indicate that Logan was in a 'daze' such that he was incapable of voluntarily consenting to

a search and to writing a statement of confession." (Id.) Logan objects to the Magistrate Judge's conclusion that, "Even accepting as true that Logan's mental condition was impaired by the over the counter medications he took the night prior, his mental condition alone does not make his confession involuntary absent police misconduct." (Id. at 29.) Logan objects to the Magistrate Judge's conclusion that, "Accordingly, Logan's consent to search and the statements were voluntary, and it is recommended that his motion to suppress these statements be denied." (Id.)

Statements must be voluntary under the Fifth Amendment Due Process Clause even if a suspect is not in custody. Beckwith, 425 U.S. at 347-348. "[W]hen a criminal defendant can show that coercive police activity caused him to make an involuntary confession, due process prohibits the government from relying on the statement." Jackson v. McKee, 525 F.3d 430, 433 (6th Cir. 2008). Voluntariness is determined by examining "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. 428, 434 (2000).

Involuntariness hinges on whether the actions of the agents subjugated the will of the defendant. Mincey v. Arizona, 437 U.S. 385, 398-402 (1978). The Sixth Circuit examines three factors: (1) whether the police activity was objectively

coercive; (2) whether the alleged police misconduct was sufficient to overbear the defendant's will; and (3) whether the alleged misconduct was the crucial motivating factor in the defendant's decision to make the incriminating statement. United States v. Johnson, 351 F.3d 254, 260 (6th Cir. 2003) (internal citation omitted).

There is no evidence of any objectively coercive police misconduct. Because Logan testified that he does not remember the first and second interviews, the Magistrate Judge relied, and the Court relies, on the testimony of Agents Thompson and Melancon about the interviews. (Report at 27.) The Magistrate Judge found that Agents Thompson and Melancon's testimony about the two interviews was credible. (Id.) Both agents testified that they did not coerce, threaten, intimidate, or use physical force against Logan. (Id.) The door remained open and unblocked during both interviews. (Id.) Both interviews lasted a relatively short time. (Id.)

The Magistrate Judge concluded that Logan's behavior was coherent during the first and second interviews. Agents Thompson and Melancon testified that Logan did not appear to be under the influence of drugs, did not have difficulty answering questions, did not resist questions, and did not need guidance in speaking or walking. (Id. at 28.) Logan's lack of memory about the interviews during the evidentiary hearing does not

belie the fact that his behavior indicated he was coherent during both interviews.

Even if Logan had been in a daze during the interviews, his statements would not be involuntary without agent misconduct. "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity" is never, standing alone, sufficient to conclude that a confession is involuntary or a waiver is unknowing; "some element of police coercion is always necessary." United States v. Newman, 889 F.2d 88, 94 (6th Cir. 1989); see also United States v. Dunn, 269 F. App'x 567, 573 (6th Cir. 2008) (finding that a suspect's waiver of Miranda rights was knowing and intelligent because he was "alert, coherent, and lucid" during questioning, despite being under the influence of Vicodin and Marijuana at the time of his arrest); United States v. Treadwell, 11 F. App'x 502, 511 (6th Cir. 2001) (holding that a defendant's consumption of "an intoxicating medication in a dose more than five times that prescribed by state physicians" did not render confession involuntary); Wernert v. Arn, 819 F.2d 613, 616 (6th Cir. 1987) (upholding the admission of a confession although the defendant claimed that her drug and alcohol ingestion the day before and her lack of food and sleep prohibited her from voluntarily waiving her rights). There was no coercion during the first or second

interview. Logan's statements were voluntary. The Court OVERRULES Logan's seventh, eighth, ninth, and tenth objections.

### 4. Logan Was Advised of his Rights

Logan objects to the Magistrate Judge's conclusion that Agent Thompson told him he had the right to speak to an attorney. (Objections ¶ 13.) Logan argues that that right "was not set out in the written statement nor was it set out in the report of the agents concerning the events of the search and the questioning." (Id.)

Logan's objection is not well taken. Logan was not in custody when Agent Thompson administered the rights or when Logan made the statements at issue. Logan made his statements voluntarily.

The Magistrate Judge concluded, and the Court agrees, that Agent Thompson's testimony about the interviews was credible. Agent Thompson testified that he advised Logan of his right to an attorney. The record provides "no compelling reason to second-guess the magistrate judge's decision." Peveler, 269 269 F.3d at 702; 412 F. App'x at 743. The court OVERRULES Logan's eleventh objection.

### IV.  Conclusion

The Court OVERRULES Logan's objections and ADOPTS the Report and Recommendation of the Magistrate Judge. Defendant's

Motion to Suppress Statements and Motion to Suppress Items are DENIED.

So ordered this 28<u>th</u> day of May, 2014.

/s/_Samuel H. Mays, Jr._____
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE
